**CITY OF PIPESTONE, by Warren Spannaus, Attorney General of the State of Minnesota, Appellant,**

v.

**John HALBERSMA et al., Respondents,**

**Edward Halbersma et al., Defendants.**

**No. 49584.**

Supreme Court of Minnesota.

April 18, 1980.

Warren Spannaus, Atty. Gen., Gilbert S. Buffington, Sp. Asst. Atty. Gen., St. Paul, James H. Schaefer, Pipestone City Atty., Pipestone, for appellant.

Coulter, Nelson, Sullivan & Frevert, V. Owen Nelson, Mark Sullivan, and Wells H. Anderson, Minneapolis, for respondents.

KELLY, Justice.

The City of Pipestone appeals from the district court's denial of its petition to condemn 91.4 acres of land in Gray Township, Pipestone County, Minnesota. The city seeks to exercise its power of eminent domain for the purpose of expanding its municipal airport. The district court, pursuant to a stipulated remand,[1] held that although the city established that the taking was for a public purpose, it failed to establish a public necessity for the taking. We reverse.

The facts may be briefly stated. In 1971 the Pipestone City Council commenced its airport planning process because of a perceived need for airport improvements. This perceived need for improvements, including a longer runway, arose from the council's review of the Pipestone Airport Commission's and the Pipestone Area Development Corporation's findings that better transportation facilities would attract industry to the city's existing industrial park. According to these findings, better transportation facilities included an airport adequate to support aircraft used by industry. Therefore, the city hired a consulting engineering and planning firm to draft a master airport plan in 1971. After careful consideration the city adopted the airport master plan in 1975. This plan was offered as evidence at trial. An engineer from the consulting firm that drafted the plan, Richard Beckman, testified that although the Pipestone Airport is classified as a "Basic Utility II" airport by the Federal Aviation Authority (FAA), its existing north-south runway is only 3100 feet in length rather than the required 3700 feet. He testified that, in addition to this 600 foot extension, an extra 900 feet of runway is needed because the northern end of the runway is too close to existing structures to comply with state standards on aircraft approach "clear zones." Thus, moving the runway another 900 feet south would put the buildings beyond the northern "clear zone." He testified that the remaining 1600 feet to be acquired through this taking were to serve as "clear zones" to the south of the runway. Part of the 1600 feet would later be used

---

1. The district court originally granted the city's petition to condemn the land in question. Respondents in this appeal, the property owners, appealed that order. At the prehearing conference there appeared to be some inconsistency between the district court's order and memorandum with respect to the question of a public necessity to acquire the land. The parties stipulated to a remand. On remand the district court, by supplemental order, denied the city's petition. Therefore, respondents, the property owners, dismissed the original appeal and the city now appeals the supplemental order of the district court.

for another extension of the runway, the clear zones for such an extension already having been purchased by an "easement to the ground" from the landowners south of the respondent landowners in this case. The engineer testified that six of the twelve airplanes based at Pipestone's airport at the time of the hearing required at least 3700 feet of runway.

The city called additional witnesses who supported the need for an airport expansion. Dr. Wilber Shliefer, president of the Pipestone Airport Commission, testified that after extensive research on the subject the Commission concluded that the existing 3100 foot runway was insufficient for modern high performance twin engine aircraft both in terms of safety and utilization of full load-carrying capabilities.

Assistant Commissioner Lawrence McCabe, Aeronautics Division, Minnesota Department of Transportation, discussed airport needs. He stated that modern aircraft need longer runways than the older, smaller aircraft models and that the use of airplanes is increasing at a rate of 5 to 6 percent in Minnesota.

The city also introduced into evidence the Pipestone City Council's resolution of January 5, 1978 in which the council formally found that acquisition of the 91.4 acres was necessary to effectuate a public purpose, the airport improvement project.

In the course of cross examining the engineer, the landowners established that an ideal runway at Pipestone would be constructed in a northwest-southeast direction. Instead the city proposes an extension to its existing north-south runway. The landowners called one witness, Gary Kottke. He testified that he was an experienced pilot and that he flew into the Pipestone airport once in 1973 or 1974. He opined that there would be nothing dangerous about flying any of the airplanes presently based at Pipestone from the existing 3100 foot runway.

■ The city may exercise the power of eminent domain for the purpose of enlarging its airport. Minn.Stat. § 360.032 (subd. 2) (1978) provides in pertinent part:

"Property needed by a municipality for an airport * * * or for [its] enlargement * * * or for other airport purposes, may be acquired by * * * condemnation in the manner provided by law * * * ."

Minn.Stat. § 360.033 (subd. 1) (1978) provides:

The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; the acquisition of airport protection privileges; the acquisition, establishment, construction, enlargement, improvement, maintenance, equipment, and operation of airports and other air navigation facilities, and the exercise of any other powers herein granted to the state or to municipalities are hereby declared to be public, governmental, and municipal functions, exercised for a public purpose, and matters of public necessity, and such lands and other property, easements, and privileges acquired and used by the state and such municipalities in the manner and for the purposes enumerated in sections 360.011 to 360.076, shall and are hereby declared to be acquired and used for public, governmental, and municipal purposes and as a matter of public necessity.

The standard of review of determinations of public use and necessity by condemning authorities was thoroughly discussed by this court in *Housing and Redevelopment Authority v. Minneapolis Metropolitan Co.*, 259 Minn. 1, 104 N.W.2d 864 (1960).

Great weight must be given to the determination of the condemning authority, and the scope of review is narrowly limited. If it appears that the record contains some evidence, however informal, that the taking serves a public purpose, there is nothing left for the courts to pass upon. Courts may interfere only when the Authority's actions are manifestly arbitrary or unreasonable. The acts of an authority vested with legislative determination in a particular area are manifestly arbitrary or unreasonable where they are taken capriciously, irrationally, and without basis in law or under conditions which do not authorize or permit the exercise of

the asserted power. The court is precluded from substituting its own judgment for that of the Authority as to what may be necessary and proper to carry out the purpose of the plan. (Footnote omitted.) *Id.* at 15, 104 N.W.2d at 874.

The condemning authority is not required to show an "absolute or indispensable necessity, but only that the proposed taking is reasonably necessary or convenient for the furtherance of a proper purpose." *The Kelmer Corp. v. District Court of Fourth Judicial District,* 269 Minn. 137, 142, 130 N.W.2d 228, 232 (1964). The mere suggestions of possible alternatives to the condemning authority's plan will not in itself support a finding of arbitrariness. *Metropolitan Sewer Board v. Thiss,* 294 Minn. 228, 230, 200 N.W.2d 396, 397 (1972).

 The landowners do not contend that airport expansion is not a public use. Instead, they argued to the district court that Minn.Stat. § 360.032 (subd. 2) (1978) required a higher showing of public necessity than a showing of reasonableness of a means to an end. In support of this proposition they cite *Reilly Tar & Chemical Corp. v. City of St. Louis Park,* 265 Minn. 295, 121 N.W.2d 393 (1963):

> Where the power to exercise eminent domain has been delegated to a municipality or to a public service corporation, and the statutory delegation of such power limits the exercise thereof to situations where there is an actual need therefor, such municipality or public service corporation may not proceed under the statute in the absence of such a need. When it does so, the courts may hold its actions in excess of the statutory authorization and hence invalid. *Id.* at 301, 121 N.W.2d at 397.

In *Reilly,* however, the statute authorizing the taking was considerably different from the statute with which we are presently dealing. That statute read in part as follows:

> " 'There is hereby created in each municipality in this state a public body corporate and politic, to be known as the housing and redevelopment authority in and for that municipality; provided, however, that no such authority shall transact any business or exercise any powers until the governing body of the municipality shall, by proper resolution, *find* that in such municipality (1) substandard, slum, or blighted areas exist which cannot be redeveloped without government assistance, (2) adequate housing accommodations are not available to veterans and servicemen and their families, or (3) there is a shortage of decent, safe, and sanitary dwelling accommodations available to persons of low income and their families at rentals they can afford * * *.' (Italics supplied.)" *Id.* at 297, 121 N.W.2d at 394–5 (quoting Minn.Stat. § 462.425 (subd. 1) (1961)).

This provision sets definite limits on the power of the condemning authority, clearly justifying the holding of the court as set out above. In the present case the statute is much less limiting. Minn.St. 360.032 (subd. 2) (1978) states in part:

> "Property *needed* by a municipality for an airport * * * or for [its] enlargement * * * or for other airport purposes, may be acquired by * * * condemnation in the manner provided by law * * *." (Emphasis supplied.)

Thus, we cannot agree that this statute mandates a higher judicial finding of public necessity. In this case the issue of public necessity for a taking of private property in a condemnation proceeding is legislative rather than judicial. Here the city council determined by resolution on January 5, 1978, that the taking was necessary to accomplish a needed airport expansion. The resolution is prima facie evidence of public use and the issue of the taking as a means reasonably necessary to accomplish that use. After a careful review of the record, we cannot say that the city council's decision to expand the existing runway was arbitrary or capricious. The taking of 91.4 acres is a reasonable means of accomplishing that end. The record supports the city's decision that the present runway was inadequate to support modern aircraft including 6 of 12 aircraft presently based there and that modern aircraft require longer runways in terms of safety and full load utilization. It also supports the city's inference that an improved airport is more likely to

attract industry than the airport which presently exists. The fact that an ideal airport's runways would be constructed in a northwest to southeast direction is not controlling in light of the fact that the record shows that such a runway would improve the statistical likelihood of a pilot's ability to land in all weather conditions only one and one half percent over a north-south runway of equal length. The mere suggestion of possible alternatives to the city's plan does not support a finding of arbitrariness. *Metropolitan Sewer Board v. Thiss*, 294 Minn. 228, 230, 200 N.W.2d 396, 397 (1972).

The supplemental order of the district court denying the city's petition to condemn dated November 1, 1978, is reversed. The previous order of the district court dated April 18, 1978, vesting title to the lands in question in the city and appointing commissioners to assess damages sustained by the landowners on account of the taking is reinstated.

Reversed and remanded.

OTIS, J., took no part in the consideration or decision of this case.