CITY OF DULUTH, Petitioner, Respondent, Lake Superior Paper Industries, Intervenor, Respondent,

v.

STATE of Minnesota, County of St. Louis, et al., Lower Court Respondents,

Jeno F. Paulucci, et al., Appellants.

No. C4–86–984.

Supreme Court of Minnesota.

Aug. 1, 1986.

Frank R. Benman, Scott G. Harris, James E. Kelly, Minneapolis, for appellants.

David P. Sullivan, Jerome Agnew, Duluth, for City of Duluth.

Harold Frederick, Duluth, for Lake Superior Paper.

760

YETKA, Justice.

This case comes to this court on a petition for accelerated review from the judgment of the Sixth Judicial District Court, St. Louis County, granting the City of Duluth's petition of condemnation and awarding Duluth title and possession of certain property. The property at issue is owned by Jeno and Lois Paulucci both directly and by companies they control and is located in West Duluth. We affirm the decision of the district court.

The issues raised in this appeal are:

1. Is there a "public use" for the taking of Pauluccis' property under the Fifth Amendment to the United States Constitution and Minn. Const. art. 1, § 13?
2. Was the city's condemnation of land in this case "necessary" for the papermill project?
3. Did the city comply with the condemnation procedures of Minn.Stat. chs. 458 and 472A (1984)?

To decide properly the above issues, it is necessary to set out rather lengthy facts as follows:

Over the past 9 years, the City of Duluth has attempted to persuade several paper companies to construct a papermill on a 72-acre site in West Duluth that includes Pauluccis' property. Duluth wished to revitalize the land because of abandoned and tax-forfeit property in the area. The area was thought to be appropriate for a papermill in part because of the nearby Hibbard Plant, an abandoned electric generating facility owned by Minnesota Power whose boilers could be retrofitted to provide steam and electricity to a mill. The person in charge of this effort was Jack LaVoy, special projects administrator for Duluth. To increase the attractiveness of the area to potential investors, the city sought and obtained border city enterprise zone status in 1983. A target area of 400 acres, including most of the papermill site, was specifically designated an enterprise zone. Duluth never considered any other land acceptable for development by a papermill and never showed any site other than the

West Duluth area to interested paper companies. Duluth contacted several paper companies, but those attempts to attract a papermill were unsuccessful until the spring of 1984 when Pentair, Inc., expressed an interest in the proposed site. After some study, Pentair told Duluth it would require a partner before proceeding with the papermill since the cost of a new papermill would tax the resources of Pentair by itself. Duluth located a possible partner, Minnesota Power & Light, and arranged a meeting between the two companies. In May 1985, Pentair and Minnesota Power formed a joint venture to study the feasibility of a papermill at the West Duluth site. At approximately the same time, April 22, Jack LaVoy resigned his position and David Sebok, LaVoy's supervisor, took charge of the project for the city. In May, LaVoy was hired as a consultant to the joint venture.

The 72-acre site offered by the city for study included small businesses, homes and the approximately 18 acres of land owned by the appellant, Jeno Paulucci. Some of the Paulucci property is vacant, but in the northeast corner of the site stands the Chun King building used for Oriental food processing until the 1970's. At the time of the joint venture study, the Chun King building was mostly unused though two businesses, a tire-capping company and Grandma's, Inc., were renting space. However, Paulucci indicated that he was planning a reopening of the Chun King plant as a processor of Oriental Foods.

The joint venture began its feasibility study on July 1. On July 8, shortly after the joint venture began the feasibility study, it decided to ask for another 20 acres of land, expanding the area of the proposed development to 92 acres. The additional 20 acres would be gained by moving the westerly boundary from 53rd Avenue West to Central Avenue. Different reasons for the additional acreage were adduced by various members of the joint venture. David Beal, an employee of Pentair, stated that environmental concerns over the noise, dust, and heavy traffic af-

fecting residents in the "pocket" between the 72-acre site and Central Avenue necessitated the expansion. Ronald Kelly, vice president in charge of corporate development at Pentair; Jack LaVoy, joint venture consultant; and Jack Rowe, chairman of the Board of Directors, all stated that the land was primarily needed for expansion of the papermill from one to two or possibly three machines, but that environmental concerns were also a factor. At a meeting between Jack LaVoy and David Sebok, Duluth's city planner, LaVoy asked for 20 more acres to accommodate a third machine. Sebok agreed to the request during the meeting.

The feasibility study continued throughout the summer of 1985 and was concluded in October with a recommendation that the papermill proceed. The results of the study were published in the Duluth press in October. The stories noted or implied that the Chun King building would be replaced by the proposed papermill. At some point in October or November, Pentair and Minnesota Power formally agreed to a joint venture for the purpose of constructing a papermill in West Duluth. The name of the new company was Lake Superior Paper Industries (LSPI).

On October 29, Duluth Mayor John Fedo sent a letter to landowners in the West Duluth site notifying them of a meeting to discuss the proposed papermill and its impact on affected landowners. A map was attached to the letter showing the Chun King building to be part of the papermill site. Copies of the letter were sent to Pauluccis' personal address and the address of his corporation, Jeno's, Inc. Neither Paulucci nor his employee, Ronald Scinocca, recall reading the letter.

On November 1, 1985, notice of a public hearing on November 12 to discuss the creation of an industrial park in the West Duluth area was published in Duluth's *News-Tribune & Herald.* The hearing was held before the Duluth City Council and concerned the creation of Development District No. 6.

At its regular meeting on November 18, 1986, the city council authorized a development agreement between LSPI and Duluth, calling for the construction of the papermill and obligating the city to use its best efforts in obtaining the required property by eminent domain. Also on November 18, Duluth adopted a resolution, pursuant to Minn.Stat. chs. 273 and 472A, creating Development District No. 6 and adopting a tax increment financing plan for the district. The development district is 156 acres, encompassing all of the 92-acre site proposed for the papermill. On December 2, the city council created an advisory board for Development District No. 6 and appointed the seven members.

Pursuant to a notice published in the *News-Tribune & Herald* on December 6, the city council held a public hearing on December 16, 1985, and created Industrial Development District No. 1 pursuant to Minn.Stat. § 458.191. The boundaries were co-terminous with Development District No. 6. On the advice of its attorney, the council made findings at this time that the lands within the industrial district were "marginal."

At some point in December 1985 or January 1986, Jeno Paulucci admitted he was aware that the papermill project would entail the destruction of his Chun King plant. In an interview with the *News-Tribune & Herald* of December 15, 1985, Paulucci was quoted as saying it was more important that the papermill be built than that the Chun King building be preserved. On February 20, 1986, Paulucci reviewed a layout of the plant site and decided there was room for both the Chun King building and the papermill. On February 21, Paulucci wrote to Mayor Fedo of Duluth, outlining a proposal for the co-existence of the two businesses. Mayor Fedo referred the matter to Dave Sebok, who, in turn, contacted Ronald Kelly, who, since January 1, 1986, has been president of LSPI. Kelly contacted Rust Engineering, the engineering design firm used by LSPI for the papermill, about the possibility of building the papermill without using *any* Paulucci property. Rust Engineering reported on February 28

that the plant could not be built under those conditions. On March 1, Kelly wrote to Sebok relaying this message, which was also relayed to Paulucci. Legal proceedings began on March 7, 1986, when the City of Duluth filed with the St. Louis County District Court its petition in condemnation and deposited $618,378, the city's appraised value of the Paulucci interests property, with the court. On March 11, 1986, Jeno Paulucci, Lois Paulucci and PFL, Inc., a Minnesota corporation with interests in the land being condemned, were mailed notice of the city's intention to utilize the "quick-take" procedures of Minn.Stat. § 117.042. On March 18, 1986, PFL, Inc., was served with an amended notice of petition in condemnation establishing a hearing for April 17, 1986. On March 21, 1986, Jeno and Lois Paulucci were also served with notice of the petition in condemnation set for an April 17, 1986 hearing. On April 10, PFL, Inc., and the Pauluccis filed objections to the condemnation petition.

The case was tried in the District Court of the Sixth Judicial District between May 6 and May 23, 1986. Title to the appellants' property was to transfer on June 10. The decision was immediately appealed. The petition for accelerated review was granted on June 26, 1986.

### Standard of Review

The standard by which this court will review the findings of the district court is found in Minn.R.Civ.App.P. 52.01: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial judge to judge the credibility of the witnesses." Following this rule, the court will order a reversal if, upon reviewing all the evidence, the court is "left with the definite and firm conviction that a mistake has been made." However, in line with Rule 52, a trial court's findings of fact will be subject to review *de novo* where those findings are

based on documentary evidence equally available to this court. *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 225–26, 243 N.W.2d 302, 305, *cert. denied*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

1. *Is There a "Public Use" For the Taking of Pauluccis' Property Under the Fifth Amendment to the United States Constitution and Minn. Const. Art. 1, § 13?*

The Fifth Amendment of the United States Constitution provides in part: "[P]rivate property [shall not] be taken for public use without just compensation." This restriction on the condemnation of privately owned property is made applicable to the states through the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). The Minnesota Constitution contains a similar restriction on condemnation in article 1, section 13. It provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

In *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the United States Supreme Court held that the public use requirement of the Fifth Amendment is "coterminous with the scope of a sovereign's police powers." 467 U.S. at 240, 104 S.Ct. at 2329. Thus, the Court noted, the role for the judiciary to play in reviewing a legislative judgment of what constitutes a public use is "an extremely narrow" one. *Id.* (quoting *Berman v. Parker*, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954)). Judicial deference to a legislative determination that land being condemned is for a public use is, the Court noted, "required until it is shown to involve an impossibility." *Id.* (quoting *Old Dominion Co. v. United States*, 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162 (1965)).[1]

---

1. In *Hawaii Housing Authority,* the Court upheld the Hawaii Land Reform Act of 1967, Haw.Rev. Stat. ch. 516, which provided for the condemnation of residential tracts owed by lessors and the

transferring of such tracts to existing lessees. The Court concluded that the legislature's regulation of land oligopoly and the evils associated therewith was "a classic exercise of a State's

This court has also recognized the limited role of the judiciary in reviewing condemnation determinations. In *Housing and Redevelopment Authority v. Minneapolis Metropolitan Co.*, 259 Minn. 1, 104 N.W.2d 864 (1960), this court stated:

> Great weight must be given to the determination of the condemning authority, and the scope of review is narrowly limited. If it appears that the record contains some evidence, however informal, that the taking serves a public purpose, there is nothing left for the courts to pass upon. Courts may interfere only when the Authority's actions are manifestly arbitrary or unreasonable. The acts of an authority vested with legislative determination in a particular area are manifestly arbitrary or unreasonable where they are taken capriciously, irrationally, and without basis in law or under conditions which do not authorize or permit the exercise of the asserted power. The court is precluded from substituting its own judgment for that of the Authority as to what may be necessary and proper to carry out the purpose of the plan.

*Id.* at 15, 104 N.W.2d at 874 (footnote omitted).

■ What constitutes a public use under Minn. Const. art. 1, § 13 is, of course, a judicial decision; however, in light of the deferential scope of review, this court has construed the words "public use" broadly. Historically, the court has used the words "public use" interchangeably with the words "public purpose," thus implying that even though a public entity, using its eminent domain powers, turns over parcels to a private entity for use by that private entity, the condemnation will, nevertheless, be constitutional if a public purpose is furthered by such a transfer of land.

In *City of Minneapolis v. Wurtele*, 291 N.W.2d 386 (Minn.1980), this court upheld the condemnation of parcels for the construction of a privately owned downtown mall. The court deferred to the city council's determination that a downtown mall was essential to maintaining a viable business district in the city. A public purpose was recognized because there was evidence that the construction of the mall would create permanent and temporary employment, generate retail sales, and increase the tax base of the city.[2]

In arguing that the construction of a papermill would further a public purpose, the city introduced evidence that the mill would provide permanent and temporary employment in an economically distressed area of the state.

The city also introduced evidence that the papermill would revitalize an area of the city that is currently inadequate for development. The city points out that the West Duluth neighborhood in which the mill will be located is currently unsuitable for development because it was platted a century ago and the shapes and sizes of the residential lots do not conform to modern residential needs. Commercial tracts currently exist alongside residential lots and the area contains undeveloped parcels and abandoned tracts of land, including a toxic waste dump. By constructing the papermill in this area, the city maintains, development would be limited to heavy industry, residents of the area would be relocated to more suitable residential areas, and the infrastructure, currently deteriorating and obsolete, would be replaced to accommodate industrial development.

■ The revitalization of deteriorating urban areas and the alleviation of unemployment are certainly public goals. *See Wurtele*, 291 N.W.2d at 390. There is little

police powers." 467 U.S. at 242, 104 S.Ct. at 2330. The condemnation procedure established by the legislature to deal with the problem, the Court concluded, was not irrational. *Id.*

**2.** Appellate courts in other jurisdictions have also determined that proposals to condemn and transfer property from one private owner to another are justified on the ground that the economic benefit that results is "public" in nature. *See Prince George's County v. Collington Crossroads, Inc.*, 275 Md. 171, 339 A.2d 278 (1975); *Poletown Neighborhood Council v. City of Detroit*, 410 Mich. 616, 304 N.W.2d 455 (1981).

doubt, however, that the exercise of the city's eminent domain powers in this case will also benefit the *private* interests of owners of the papermill. In light of this court's decision in *Wurtele*, however, this fact alone does not make the use of such eminent domain powers unconstitutional. As long as the predominant purpose being furthered is a public one, the condemnation is constitutional under Minn. Const. art. 1, § 13 and, in light of the *Hawaii Housing Authority* case, is valid under the United States Constitution as well in meeting the federal requirement of public use.

### 2. . *Was the City's Condemnation of Land in This Case "Necessary" For the Papermill Project?*

Paulucci makes several related arguments that the city's condemnation of Paulucci property is not "necessary" and that the district court erred in finding otherwise. The arguments are based on his contentions that: other, and better, sites are available for locating a papermill; the papermill and the Chun King plant could co-exist on the site; the city's resolution declaring the condemnation of the Chun King property necessary for the project was based on an arbitrary and capricious decision; and the district court improperly relied on the city's determination of necessity rather than coming to its own independent decision.

In a related argument, Paulucci contends that condemning his property is not necessary to carry out the designs of the city and LSPI. He argues that the papermill can be built without using his property, allowing both the mill and the plant to operate.

In *Housing and Redevelopment Authority v. Minneapolis Metropolitan Co.*, 259 Minn. 1, 104 N.W.2d 864 (1960), this court stated the general proposition that, once a public purpose is found to a condemnation action, the only question left for the court is that of adequate and just compensation. This statement alone would indicate that no question of necessity is before a court in a condemnation proceeding.

*Metropolitan* goes on, however, to find that, while courts generally have disclaimed the power to supervise the selection of a site for public improvement, "they are reluctant to surrender their right to prevent an abuse of the discretion delegated by the legislature by an attempted appropriation of land in utter disregard of the public necessity of its use." *Id.* at 14, 104 N.W.2d at 874. In explaining the extent of this right, the court stated that great weight was to be given the condemnor's determination and that a court was precluded from substituting its own judgment for that of the condemnor. "We do not understand that it is the function of the court to decide between conflicting opinions of the parties as to the advisability of a discretionary act." *Id.* at 15, 104 N.W.2d at 874. The court's limited scope of review would only allow the condemnor's decision to be overturned if it were "arbitrary, unreasonable, or capricious, or [if] *the evidence against the necessity* or public use *is overwhelming.*" *Id.* at 16, 104 N.W.2d at 875 (emphasis added).

Consistent with *Metropolitan*, this court has stated that, where necessity is required as part of a condemnation, its existence is a judicial question. *City of Shakopee v. Minnesota Valley Electric Cooperative*, 303 N.W.2d 58, 62 (Minn. 1981). Minn.Stat. § 117.011 (1984) mandates that all eminent domain proceedings, except those under laws relating to drainage or town roads, shall follow the format of that chapter. Section 117.075 states that the district court shall appoint three commissioners to value the property only after a determination that "the proposed taking shall appear to be necessary and such as is authorized by law." We thus affirm that it is the intent of our constitution and statutes that, in all eminent domain cases in this state, necessity, as well as public purpose, must be shown.

Numerous cases have declared that the requisite necessity is not absolute necessity. It is enough to find that "the proposed taking is reasonably necessary or convenient for the furtherance of a proper

purpose." *City of Pipestone v. Halbersma,* 294 N.W.2d 271, 274 (Minn.1980) (quoting *The Kelmar Corp. v. District Court of Fourth Judicial District,* 269 Minn. 137, 142, 130 N.W.2d 228, 232 (1964)). Finally, a district court's finding that the required necessity does exist should be overturned only if clearly erroneous. *See County of Blue Earth v. Stauffenberg,* 264 N.W.2d 647 (Minn.1978).

■ Paulucci argues that the district court in this case made no finding with regard to necessity, but, rather, simply bowed to the determination of the city. He alleges that if the court had come to an independent decision, it would have been that necessity does not exist and that the court's failure to come to an independent conclusion deprived him of his right to litigate whether a specific interest in a particular piece of property is necessary. That right is found in *Cooperative Power Ass'n v. Eaton,* 284 N.W.2d 395 (Minn.1979). In that case, the district court had determined that no factual dispute existed as to the necessity of the condemnation. This court disagreed and remanded so that evidence could be taken regarding the necessity for the broad type of easement sought. If the district court below had neglected to decide the necessity issue, *Eaton* indicates that such action would be incorrect. However, the trial court did decide the issue.

True, the district court did rely on the city's findings. Finding No. 27 shows that the court looked at the findings of the city in both the development program and the agreement with LSPI and found them to support the city's finding of a public purpose. Finding No. 26a recognizes the city resolution that acquiring the Paulucci property was necessary. Finding No. 30 states: "Pursuant to the Findings of Fact made by Duluth, the property of the respondents is reasonably necessary, or is reasonably convenient to achieve the public purpose objectives."

In *City of Pipestone v. Halbersma,* 294 N.W.2d 271 (Minn.1980), this court held that a resolution by a city council that a taking was necessary to accomplish a proper purpose was prima facie evidence of that necessity, at least where no higher judicial finding of necessity is mandated by the statute. The statute involved in *Halbersma,* Minn.Stat. § 360.032, subd. 2 (1978), stated: "Property needed by a municipality for an airport * * * may be acquired by * * * condemnation." This statute did not mandate any higher judicial finding of necessity than "reasonably necessary or convenient for the furtherance of a proper purpose" standard already discussed.

The three authorizations for exercising eminent domain that the city points to in this case similarly impose no higher standard. Minn.Stat. § 472A.03 (1984) allows a municipality to use eminent domain to acquire "developments aimed at improving the physical facilities, quality of life and quality of transportation" consistent with a development program for a designated district. Minn.Stat. § 458.192, subd. 2 (Supp. 1985) authorizes a port authority to acquire by "condemnation proceedings the needed right, title and interest in property to create industrial development districts." The Duluth Home Rule Charter empowers the City of Duluth "to acquire, by * * * condemnation, any property * * * which may be needed by said city for any public use or purpose." Duluth City Charter § 1. According to the reasoning of *Halbersma,* the city resolution and, logically, the findings underlying that resolution are evidence to be considered by the district court. Further, the district court's memorandum attached to the order explains this apparent reliance. The court states that it has found that the city has met all the legal requirements, apparently including that the taking be necessary or convenient, and that it does not have the authority to carve out a few acres for Paulucci. Later, the court specifically rejected Paulucci's contention as to the lack of necessity in condemning his property. "[I]t is a governmental decision as to size. The Court does not have authority to substitute its views for the views of the City Council. In their wisdom and discretion decisions were made, and the court must adhere to that process, absent

fraud, or arbitrariness or caprice." Finally, the court, in discussing the power of eminent domain, states: "The Court only determines whether the government, (in this case Duluth) acted arbitrarily, capriciously, or fraudulently." This memorandum indicates not so much that the district court blindly followed the city's determinations, but, rather, that the court understood the limited scope of review over condemnation proceedings.

Paulucci is correct in stating that the district court issued no specific findings regarding its own determination of necessity. Rather, it found that, in light of the limited scope of review, the city's determinations should be upheld. In *Halbersma,* after holding that the city council resolution's findings of public use and necessity were prima facie evidence of those characteristics of the condemnation, this court went on to review the record carefully to determine if the council's decision as to the need for the public improvement was arbitrary or capricious.

▪ In the trial transcript, there is much testimony as to the necessity, or lack thereof, for the Paulucci property to be included in this condemnation. At trial, Pauluccis' counsel elicited a great deal of testimony regarding possible alternatives to the site in issue. Therefore, it should be noted that, when reviewing a condemnor's decision on the necessity of its action, merely suggesting "possible alternatives to the city's plan does not support a finding of arbitrariness." *Metropolitan Sewer Board v. Thiss,* 294 Minn. 228, 230, 200 N.W.2d 396, 397 (1972).

▪ There was a great deal of testimony supporting both sides of the issue of whether it is necessary for the city to condemn Pauluccis' food processing plant. Given the standard of review for a condemnor's determination of necessity, as discussed earlier, this split of evidence clearly supports upholding the city's decision.

▪ Paulucci contends that the city's decision to condemn the land that it did for the papermill development is "prima facie arbitrary" because the city made no independent finding of necessity, but, instead, relied solely on the studies of the joint venture. For this contention, Paulucci relies on this court's previous decisions concerning denials of special use permits. *See Holasek v. Village of Medina,* 303 Minn. 240, 226 N.W.2d 900 (1975); *Metro 500, Inc. v. City of Brooklyn Park,* 297 Minn. 294, 211 N.W.2d 358 (1973); *Inland Construction Co. v. City of Bloomington,* 292 Minn. 374, 195 N.W.2d 558 (1972). Apart from the fact that these cases concern the quasi-judicial act of applying a zoning ordinance to individual parcels and that this case concerns the purely legislative act of condemnation, these decisions stand for the proposition that a prima facie case of arbitrariness is established only in those cases in which a local legislative body does not provide a legally sufficient basis for its land use decision. By merely denying, for example, a conditional use permit without stating the basis on which such a decision is made, a local legislative body does not afford a reviewing court a record on which to determine whether the decision was, in fact, arbitrary. Thus, this court has held that, in such a case, such a decision is "prima facie arbitrary." Here, a sufficient evidentiary basis exists. Whether the City of Duluth relied on the findings of another party or made findings of its own concerning the necessity to condemn the land it did, a record was, in either case, established on which a reviewing court could determine whether the condemnation was, in fact, arbitrary. A prima facie case of arbitrariness was not, in this case, established.

Our decision might be different if the Chun King plant were actually in operation employing the 500 people contemplated. However, we must accept conditions as they are today. As the city points out, the buildings are over 100 years old and in a rather dilapidated condition. The entire zone was found to be "marginal;" thus, the condemnation proceedings could be justified on the basis of urban redevelopment even if a new paper plant were not being contemplated.

It is also argued that the legislature and the courts have become far too lenient in allowing governmental units to exercise eminent domain in urban renewal projects, particularly where private property is condemned and then turned over to a new private venture. That argument may have some merit. However, after permitting so much new development in the Twin Cities area where an economic boom may be said to be in progress, it hardly seems appropriate to apply a more stringent rule to the City of Duluth and to northeastern Minnesota where economic depression and chronic unemployment have persisted for over a decade.

### 3. Did the City Comply With the Condemnation Procedures of Minn. Stat. Chs. 458 and 472A (1984)?

Appellant Paulucci contends that the city was without proper authority to condemn for failure to comply with the statutory requirements of Minn.Stat. chs. 458 and 472A. The city, in response, argues it has eminent domain power under its home rule charter irrespective of Chapters 458 and 472A and that, in any event, there was substantial compliance with the statutory requirements. The district court held that the only prerequisite to condemnation under the Duluth Home Rule Charter was a determination of public purpose. The district court also found that Chapter 458 procedural requirements were met and that there was substantial compliance with those of Chapter 472A.

*Home Rule Charter:*

■ Duluth's Home Rule Charter empowers the city to "take and hold, by purchase, condemnation, gift or devise, and lease and convey any and all such real, personal or mixed property, * * * as its purposes may require or as may be useful or beneficial to its inhabitants." Duluth

City Charter § 1. Similarly, section 72 of the charter provides that the city may condemn any property "needed by said City for any public use or purpose." These charter provisions are equivalent to an express delegation of the state's inherent power of eminent domain. *See City of White Bear Lake v. Leuthold,* 172 Minn. 255, 214 N.W. 930 (1927). Therefore, the charter effectively grants the city the power of eminent domain subject only to the provisions of Chapter 117:

> "All bodies, public or private, who have the right of eminent domain, when exercising the right, shall do so in the manner prescribed by this chapter, even though a different procedure may be provided by charter provisions, ordinance or statute * * *."

Minn.Stat. § 117.011 (1984).

■ The district court found the condemnation authorized by the Home Rule Charter. Appellants, however, argue that the charter was never introduced into evidence and, therefore, cannot be relied upon.[3] Appellants are incorrect. The failure to introduce a copy of the charter provision is unimportant because "the district courts and this court take judicial notice of the provisions of the city charter * * *." *City of St. Paul v. Twin Motor Bus Co.,* 189 Minn. 612, 614, 250 N.W. 572, 573 (1933); *see also Oehler v. City of St. Paul,* 174 Minn. 410, 412, 219 N.W. 760, 761 (1928); Minn.Stat. § 410.11 (1984) (upon adoption of charter, "the courts shall take judicial notice of the new charter.").

■ Nor does the petition's failure to refer to the charter preclude reliance thereon. In *City of Bloomington v. Munson,* 300 Minn. 195, 221 N.W.2d 787 (Minn.1974), the landowner contended the city was precluded from relying on its charter provision authorizing abandonment of a condemna-

---

**3.** The city's petition to condemn referred to the council's resolution of December 30, 1985. That resolution relies on Chapters 458, 472A and 474. At trial, the city moved to amend the petition to include a November 18 resolution as a basis for the condemnation. (The November 18 ordinance does not, however, expressly rely on the

city charter for authority to condemn.) A ruling on the motion to amend was delayed to give counsel "a chance to at least look at" the motion papers although the judge stated, "[M]y inclination would be to grant that." Apparently, the ruling was never made.

tion proceeding because the city's petition had not referred to its charter. The court stated:

No authority is cited for such a proposition and no reason is offered as to why this result should follow from the city's failure to refer to its charter in the notices or petitions. We perceive no reason why it should have this effect.

Home rule charters are considered a part or the body of law governing the conduct of municipal affairs. As such, respondents are charged with knowledge of the city's charter provisions.

*Id.* at 200, 221 N.W.2d at 791 (citation omitted).

■ Therefore, assuming the requirements of Chapter 117, namely, that the taking be for a public purpose, are met, the condemnation of Pauluccis' property was authorized *regardless* of whether there was compliance with Chapter 458 or 472A. In other words, while compliance with Chapters 458 and 472A is a prerequisite to the exercise of financing and tax advantages contained therein, it is unnecessary to the exercise of the power of eminent domain.

*Chapter 458:*

In October 1983, Commissioner of Energy and Economic Development Mark Dayton designated the City of Duluth a border city enterprise zone. *See* Minn.Stat. § 273.1314, subd. 4 (Supp.1985). Notwithstanding any contrary provision of law or charter, a city so designated may exercise various powers granted to other governmental subdivisions, including Chapter 458 (port authorities), Minn.Stat. § 273.1314, subd. 11 (1984). An enterprise zone city may exercise these additional powers independently or in conjunction with other redevelopment powers, including Chapter 472A. *Id.*

Chapter 458 empowers port authorities to acquire, by eminent domain, any property "needed by it for public use." Minn.Stat. § 458.17, subd. 4 (Supp.1985). The authority is also empowered to create industrial development districts to develop "marginal property."[4]

Before creating an industrial development district, "[f]irst the authority must hold a public hearing on the matter. At least 10 days before the hearing, the authority shall publish notice of the hearing in a daily newspaper of general circulation in the port district." Minn.Stat. § 458.191, subd. 1 (Supp.1985).

In the present case, Duluth held a public hearing to consider the creation of Industrial Development District No. 1 on December 16, 1985. Notice of the meeting was published in the *Duluth News-Tribune & Herald* on December 6, 1985, exactly 10 days before as required by statute.

■ Section 458.191, subdivision 1 also requires that, in establishing a development district, the authority (or, in this case, the city) "shall find that a development district is proper and desirable to establish and develop a system of harbor and river

---

4. "Marginal property" is defined as property that suffers from at least one of the following conditions:

"(1) faulty planning causing deterioration, disuse, or economic dislocation,

(2) the subdividing and sale of lots too small and irregular for good use and development,

(3) lots laid out ignoring their physical characteristics and surrounding conditions,

(4) inadequate streets, open spaces, and utilities,

(5) areas that may flood,

(6) lower values, damaged investments, and social and economic upsets reducing taxpaying capacity making tax receipts too low for the public services rendered,

(7) lack or improper use of areas, resulting in stagnant or unproductive land that could contribute to the public health, safety and welfare,

(8) lower population and some improper use of areas causing more decline, and requiring more public money for new public facilities and public services elsewhere,

(9) property valuation too low to establish a local improvement district to construct and install streets, walks, sewers, water and other utilities,

(10) lands within an industrial area not used for industry but needed for industrial development of the area, and

(11) state-acquired tax-forfeited land."
Minn.Stat. § 458.191, subd. 4 (Supp.1985).

improvements and industrial developments in its port district." Paulucci correctly points out that the council's December 16 resolution establishing district No. 1 does not expressly find that a district would be "proper and desirable." Such omission, however, seems trivial in light of the council's express finding that the district is "marginal property." The state recognizes that the development of marginal property usually requires public participation and assistance by the formation of a district.[5] Therefore, a finding that a district is "proper and desirable" is easily inferred from a finding that the area is marginal property.

▇▇▇ Appellants also attack the council's finding that the district constitutes "marginal property." Tracking the statutory definition of "marginal property," *see* footnote 4 *supra,* the council's resolution found that district No. 1 suffers from the following described conditions:

1. An economic dislocation, deterioration or disuse resulting from faulty planning;

2. The subdivision and sale of lots of irregular form and shape and inadequate size for proper usefulness and development;

3. The existence of inadequate streets, open spaces and inadequate utilities;

4. In some parts of marginal lands, a growing or total lack of proper utilization of areas, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety and welfare;

5. Property of an assessed valuation of insufficient amount to permit the establishment of a local improvement district for the construction and installation of streets, walks, sewers, water and other utilities;

6. Lands within an industrial area which are not devoted to industrial uses, but which are necessary to industrial development within the industrial area.

(Resolution of Dec. 16, 1985) The council's decision is prima facie evidence that district No. 1 is, in fact, marginal property:

> A port authority decision that property it seeks is marginal under section 458.19 is prima facie evidence in eminent domain proceedings that the property is marginal. To be prima facie evidence: (1) the decision must be made in a resolution, and (2) the resolution must state the characteristics that the authority thinks make the property marginal.

Minn.Stat. § 458.198 (Supp.1985).

Instead of rebutting this prima facie evidence by producing evidence that the property is not, in fact, marginal, appellants attack the council's findings as "made at the suggestion of counsel." Paulucci argues that the council's findings, and the city employee's inspection on which they were, at least in part, based are "wholly inadequate." However, appellants misconceive the effect of the statutory presumption. The council's findings are prima facie evidence and, therefore, shift to appellants the burden of producing evidence that the property is not, in fact, marginal. *See*

---

5. Section 458.191 (Supp.1985) states several legislative "findings," including:

> Subd. 2b(2) Marginal property cannot be developed without public participation and assistance in: (a) acquiring land, (b) planning, (c) financing of land assembly in the work of clearance and development, and (d) making necessary improvements for developing.
>
> \* \* \* \* \* \*
>
> Subd. 3(6) An individual marginal property owner has no incentive or means to fix the property while neighboring property remains unchanged, so the marginal property declines further.

(7) The decline of marginal lands often cannot be reversed except by developing all or most of it.

(8) Marginal property is mostly found in areas of small parcels having scattered ownership, often with defective titles. Many times, private development is uneconomic and practically impossible because of costs and lack of legal power.

(9) The public may have to acquire sizable areas of marginal property at fair prices to remedy the conditions on the marginal property, and to develop the areas under proper supervision, with appropriate planning and continuing land use.

Minn.R.Evid. 301. Appellants have failed to do so.

■ Paulucci also argues that, according to the city's own maps, a portion of the 92-acre site is not within the enterprise zone district and that, therefore, the city is without authority to take Pauluccis' property. However, the entire City of Duluth has been considered an enterprise zone once it was granted border city enterprise zone status. Minn.Stat. § 273.1312, subd. 4(c)(3) (1984). Apparently, 400 acres within Duluth were specifically targeted for development though this was not required by the statute. The 92-acre site is only partially within the target zone. Because the city's redevelopment powers extend to all land within Duluth and not merely the target zones, the fact that part of the papermill site is outside a target zone is irrelevant to the power to condemn.

■ Appellants' last procedural challenge under Chapter 458 argues that the city failed to establish, at trial, the source of funds used to purchase the condemned properties. Minn.Stat. § 458.192, subd. 2 (Supp.1985) provides that the city "shall pay" for property to create an industrial development district "out of money it gets under sections 458.192 to 458.1991." These sections permit the city to issue general obligation or revenue bonds, levy additional taxes, or advance money from its general fund.

Therefore, the issue becomes: Is the source of funds a jurisdictional prerequisite that must be evidenced in the record? *See* 11 McQuillan, Municipal Corporations § 32.119 (3rd ed. 1983) ("The record must disclose due observance of all jurisdictional requirements."). If so, the reference to "appropriate accounts" satisfies this requirement, at least in the absence of any evidence or even allegations to the contrary.

*Chapter 472A:*

Paulucci alleges the city's formation of a development district pursuant to Chapter 472A was constitutionally and statutorily deficient. Section 472A.03 empowers a mu-

nicipality, after consultation with its planning department "and after public hearings, notice of which shall have been published in the official newspaper," to designate development districts for the purpose of tax increment financing. Appellants concede that on November 1, 1985, notice of the public meeting (held November 12) was published in the *Duluth News-Tribune & Herald.* However, Paulucci contends the notice was constitutionally deficient because it did not "properly identify the subject matter of the public hearing" and did not notify property owners that condemnation could potentially follow creation of the district.

The November 1 notice provided:

### PUBLIC NOTICE

At 8 P.M., Tuesday, November 12, 1985, the Duluth City Council will conduct a Public Hearing in the Council Chambers in City Hall on the proposed establishment of a TAX INCREMENT FINANCING DISTRICT (St. Louis Bay Energy and Industrial Park) pursuant to Minnesota Statutes, Chapters 273 and 472A (1984).

The purpose of creating such a district is to assist in the financing of improvements in the area as a part of the overall private-public investments in commercial, industrial, and residential properties in the redevelopment district.

The area is described approximately as those lands bounded by Interstate Highway # 35 and 47th Ave. West on the north, the Minnesota State Line on the East, Sherburne Street, extended, on the south, and 57th Ave. W. on the West.

Persons living or conducting business within this area are encouraged to attend this hearing and express themselves regarding the creation of this Tax Increment Financing District.

Appellants argue that calling the proposed district a "tax increment financing district," rather than a "development district," misled the public as to the nature and subject matter of the meeting.

There seems little doubt that the notice satisfied the requirements of section 472A.03. The same section has been held to require notice "sufficient to apprise one of ordinary intelligence of the nature and subject of the meeting." *City of Minneapolis v. Wurtele*, 291 N.W.2d 386, 392 (Minn.1980). *Wurtele* upheld a notice less specific than that involved in the present case.

Appellants' constitutional challenge to the notice provision—that the notice was misleading for the above-described reason—is also foreclosed by *Wurtele*. However, Paulucci also argues that due process requires notice which informs landowners that condemnation is a potential result of district formation. Condemnation is clearly a deprivation of property requiring pre-deprivation notice and opportunity to be heard. This requirement is satisfied by the petition to condemn. Designation of a development district is not a deprivation of property; absent the statutory requirement, there would be no right to notice of meeting. While the statute itself may create a property interest; again, for the reasons set forth in *Wurtele*, any such statutorily created property right was sufficiently protected.

Appellants raise another procedural objection to the formation of Development District No. 6 under Chapter 472A. Section 472A.03 (Supp.1985) provides that the municipality "*shall \* \* \* consult* with the advisory board created by section 472A.11 *before* [designating a development district]." (Emphasis added.) In the present case, the council designated Development District No. 6 by resolution dated November 18, 1985. An advisory board was not even established until December 2. The advisory board then met on December 23, 1985, and unanimously approved the district designation.

The advisory board met again on April 4, 1986, to consider a slight modification in the tax increment plan, which was approved by the board. The proposed modification was then adopted by the city council on April 14, 1986. The April 14 resolution also stated that "the Duluth City Council hereby ratifies, approves, and confirms the establishment of Development District No. 6." *Id.* The city now argues that this April 14 "ratification," after the advisory board's December 23 meeting, somehow satisfies the statutory requirement of consultation before designation. It does not.[6]

Appellants also argue that the composition of the advisory board was statutorily deficient. Section 472A.11, regarding the advisory board, states: "Except as provided in subdivision 2, a majority of the members [of the board] shall be owners or occupants of real property located in *or adjacent to* the development district which they serve." (Emphasis added.) Appellants, ignoring the above-emphasized language, argue that no board members owned or occupied property *in* the district.[7] However, a clear majority of the board owned property adjacent to the district.

6. There is, however, a logical inconsistency in the statutory requirement of consultation before district designation. Under section 472A.11, the composition of the board depends on the character of the development district. If the district is "substantially residential," all board members must own or occupy property in or adjacent to the district's boundaries (section 472A.11, subdivision 2); otherwise, only a majority of the board need do so. "Substantially residential" means 40% or more of the district's land area is "used for residential purposes *at the time the district is designated* by the governing body." Minn.Stat. § 472A.02, subd. 4 (1984) (emphasis added). Therefore, the board's required composition cannot be determined before district designation, but designation is not to occur before board consultation. The city does not, however, contend that this paradox caused its delay in appointing an advisory board.

7. Appellants also state that the city had a policy of excluding from the board persons who resided in the development district. Actually, the city policy was to exclude persons whose land would be condemned. The proffered rationale was that such persons would be moving and unlikely to have an ongoing interest in the district. (The board continues to advise on the operation and maintenance of the district after completion of the development program. Minn.Stat. § 472A.11, subd. 1 (1984).)

*Substantial Compliance:*

■ Although appellants allege numerous procedural defects, it appears that only one requirement of Chapters 458 and 472A —that of advisory board consultation before district designation under Chapter 472A—was not met. This defect, however, will not invalidate Development District No. 6 if, as the city argues, it is insubstantial. *City of Minneapolis v. Wurtele*, 291 N.W.2d 386 (Minn.1980). *Wurtele* described the "substantial compliance" doctrine as follows:

> We note at the outset that the law does not mandate in all cases strict and literal compliance with all procedural requirements. Technical defects in compliance which do not reflect bad faith, undermine the purpose of the procedures, or prejudice the rights of those intended to be protected by the procedures will not suffice to overturn governmental action, particularly where, as here, substantial commitments have been made.

291 N.W.2d at 391, *citing inter alia*, 11 McQuillan, Municipal Corporations § 32.-119 (1977).

■ Applying these criteria, it does not reflect the tardy creation of, and consultation with, the advisory board. The defect does, to some extent, undermine the purpose of the procedure; consultation *after* creation of the district is unlikely to have any impact. Nevertheless, the board unanimously approved the district and, therefore, appellants were arguably not prejudiced by the delay.

In finding substantial compliance, *Wurtele* also emphasized that appellants were dilatory in protesting the alleged deficiencies. The court noted that appellants had "been aware of the development project from its earliest stages" and, in fact, one property owner had even consulted with the council. 391 N.W.2d at 391 n. 1. "[Y]et it was not until the city had made substantial commitments of time and money to the project and then proceeded to acquire the land to implement it that appellants complained of procedural deficiencies." 291 N.W.2d at 391. The city argues

that the same can be said of Jeno Paulucci in the present case. The project received widespread newspaper publicity as early as October 1985, which, the city contends, clearly showed Pauluccis' property was included in the site. Paulucci even aided the project by arranging a meeting with Governor Perpich in November 1985. In light of these facts, this court is reluctant to demand stringent compliance with procedural requirements.

We do feel compelled to state that, while the court affirms the district court, it is as perplexed as was the trial court in understanding why this lawsuit was necessary. Appellants apparently aided the city all along in inducing the papermill project to locate in Duluth and were aware that the Chun King plant might be utilized in the process. If there were other possible sites for the papermill, surely there are other possible sites for the re-opening of a plant by Paulucci as well. The district court said in its memorandum:

> Obviously the Chun King plant has not been operated recently, but plans to do so were known to the City for many years. Some are skeptical of these plans, but the Court does not share that skepticism. Jeno Paulucci has, on numerous occasions, and in Court, stated his goal to replace in Duluth those jobs eliminated here when Jeno's Pizza left a few years ago. It appears clear that, if the facilities exist, that commitment will be met.

> The Court is unaware of a promise or commitment by any other employer, upon leaving Duluth, to replace jobs. Only Paulucci, of all those who have left, has ever made such a promise. No one else, to my knowledge, has done so.

> Either the City of Duluth officials do not believe the commitment, or else Duluth plans, at substantial expense, to provide a new facility, even though Paulucci is perfectly happy with the present facility.

> One can only hope that Duluth will not lose the potential jobs that such a plant provides.

*    *    *    *    *    *

The Court, although in substantial sympathy with Paulucci, has not accepted his arguments on various factual disputes. For example, his contention on the size of the area has been rejected, because it is a governmental decision as to size. The Court does not have authority to subtitute [sic] its views for the views of the City Council. In their wisdom and discretion decisions were made, and the Court must adhere to that process, absent fraud, or arbitrariness or caprice.

How, then, does it happen that these two worthy enterprises, the new papermill, and the existing Chun King plant, must be located in the exact same area? Only the City can answer that question. One need only to look about Duluth to see vast stretches of sparsely or totally unoccupied area. Clearly there are engineering environmental, and technical factors to consider, but such sites would not have produced this sad state of affairs.

With the above comments by the learned district court, this court concurs. The City of Duluth apparently has gambled that it is better to go with a bird in the hand than two birds in the bush. In light of the severe economic conditions existing in northeastern Minnesota, a fact of which this court takes judicial notice, it is difficult to be critical of the City of Duluth for being as anxious as it was to satisfy the needs of the builders of this new papermill. Time only will prove whether they were overzealous in their efforts and whether Duluth will lose potential jobs that Paulucci could have provided in the Chun King plant. However, it is noteworthy that, at oral argument, the city attorney for the City of Duluth stated in open court that it was prepared to make the same effort to relocate Paulucci in Duluth as it made for the paper company. If it does so, this lawsuit could still prove fruitful.

It should also be noted that an appellate court gives great deference to the findings and conclusions of a trial court because the latter is "on the scene," hears the witness-es and is more familiar with the facts. That is particularly true in this case where the trial judge was raised in Duluth, had extensive experience as a trial lawyer before appointment to the bench, and is now a veteran and able trial judge.

We affirm the trial court in all respects.