CITY OF CENTER LINE v CHMELKO

Docket No. 95038. Submitted August 6, 1987, at Detroit. Decided November 2, 1987.

The City of Center Line instituted condemnation proceedings in the Macomb Circuit Court in an attempt to acquire two parcels of property upon which were located a print shop, a party store, several apartments, a newspaper distribution center and vacant store space. The owners and tenants of the properties, John and Eileen Chmelko, Sabah and Kathleen Hermiz, and others, filed a motion asking that the necessity of acquisition be reviewed. The trial court, Frank E. Jeannette, J., ruled that the proposed taking was for a private purpose and dismissed the condemnation action. Plaintiff appealed.

The Court of Appeals *held:*

1. The record reveals that the reasons given by the city for the condemnation were a complete fiction and that the city was acting as an agent for a private interest, a local car dealership.

2. Plaintiff received a full and fair hearing. The trial court did not err in holding that it could not find a clear and significant public interest in the taking, after applying the "heightened scrutiny" test of *Poletown Neighborhood Council v Detroit,* 410 Mich 616 (1981), which is applicable where the condemnation power is exercised in a way that benefits specific and identifiable private interests.

3. This case is one in which "heightened scrutiny" should apply. There is no clear and significant public benefit and no substantial proof that the public is to be primarily benefitted by the condemnation of the property. The primary beneficiary would be the car dealership. The public's interest in the condemnation is marginal or speculative. The city's determination

REFERENCES

Am Jur 2d, Eminent Domain §§ 27 *et seq.*

When is taking of property for "public use" so as to be permissible under Federal Constitution if just compensation is provided—Supreme Court cases. 81 L Ed 2d 931.

See also the annotations in the Index to Annotations under Eminent Domain.

of public purpose does not pass heightened judicial scrutiny under the standard of *Poletown*.

Affirmed.

1. EMINENT DOMAIN — HEIGHTENED SCRUTINY TEST.

A court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced where the condemnation power is exercised in a way that benefits specific and identifiable private interests; such public benefit cannot be speculative or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by the Legislature.

2. EMINENT DOMAIN — PUBLIC USE — PRIVATE USE.

The condemnation of private property for other than a public use is not sanctioned by the constitution; the power of eminent domain may not be exercised where the intention to confer a private use or benefit forms the purpose or a part of the purpose for the taking (Const 1963, art 10, § 2).

3. EMINENT DOMAIN — PUBLIC USE.

The "public use" question in a condemnation action is ultimately a judicial one.

*Roy W. Rogensues & Associates* (by *Alvis Phillip Easter*), for the City of Center Line.

*Stewart, Lascoe, Nowak, Maceroni & Flinn, P.C.* (by *Eric G. Flinn*), for John Chmelko, Eileen Chmelko, Barbara Sparazynski, and Eastown Printing, Inc.

*Monaghan, Campbell, LoPrete, McDonald & Sogge* (by *Boris K. Yakima*), for Sabah Hermiz and Kathleen Hermiz.

*Frank R. Langton & Associates, P.C.* (by *David L. Kaigh*), for Mikhael Sitto.

Before: SHEPHERD, P.J., and HOOD and T. M. BURNS,* JJ.

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

SHEPHERD, P.J. Plaintiff city instituted condemnation proceedings in an attempt to acquire two parcels of property upon which were located a print shop, a party store, several apartments, a newspaper distribution center and vacant store space. Pursuant to MCL 213.56(1); MSA 8.265(6)(1) defendants, the owners and tenants of the properties, filed a motion in Macomb Circuit Court challenging the necessity for the taking. Judge Frank E. Jeannette of the Macomb Circuit Court ruled that the proposed taking was for a private purpose and thus contrary to Const 1963, art 10, § 2 and dismissed the condemnation action. We affirm because it seems clear that at the hearing on the necessity for the condemnation the reasons given by the city for the condemnation were revealed to be a complete fiction. The record reveals that the city acted as an agent for a private interest, a local car dealership, Rinke Toyota.

The city's purported reasons for seeking the condemnation were set forth in the city resolution attached to its condemnation complaint:

> (1). For the acquisition, demolition and removal of a use of land that is nonconforming under provisions of the City of Center Line's Zoning Ordinance, which specify certain requirements for off-street parking and loading space not met by the present use; (2) for the acquisition, demolition and removal of a structure which, because of age, physical disrepair, deterioration, physical obsolescence, inadequate facilities and other conditions is a blighted structure, and a factor in and a cause of blight in the immediate vicinity thereof; (3) for the prevention of the deterioration of commercial property in the City to improve and stabilize the commercial business district and the tax base of the City; (4) for the demolition and removal of the structures and improvements on the land, and the conveyance of the land to a private developer for

use and development for commercial purposes in a manner that will improve the economic viability of the existing commercial district of the City, and that will improve and stabilize property values in the area and the tax base of the City, all of which purposes are hereby found, determined and deemed to be public purposes necessary for the public use and benefit of the citizens of the City of Center Line.

Ronald D. Reiterman, Assistant City Manager, Community Development Director and City Assessor, testified that in June, 1984, a representative from Rinke Toyota had approached the city about the acquisition of these two parcels of property. Rinke Toyota is located adjacent to the property in question. Representatives of Rinke Toyota explained to the city that it was extremely interested in acquiring the property so that it could expand its space for the storage of new cars. Reiterman indicated that Rinke Toyota representatives told the city that, without the ability to expand, it might have to relocate somewhere else, a move which Reiterman concluded would have a serious economic impact on the city. Rinke's legal counsel indicated to the city that it had tried unsuccessfully to purchase the property privately, and this testimony was corroborated by Sabah Hermiz, land contract purchaser of one of the parcels. Reiterman also disclosed that the city planned to turn the property over to Rinke Toyota and had accepted its offer to financially underwrite all of the expenses incurred in acquiring the property, including court costs, attorney fees, appraisal and survey costs. The city contended that the private funding of the condemnation did not alter the significant public purpose behind the taking.

The city presented the proposed taking in the instant case as just one more logical step in its

continuing and long-term efforts to address the parking shortage and other urban problems it was experiencing. Testimony at the hearing indicated that the city initiated a renewal program in 1962 to redevelop a blighted area near Van Dyke and Ten Mile Road. In 1979, to prevent further deterioration of the city's business district, the city created the Downtown Development Authority (DDA). The DDA hired a consultant who identified a series of parking shortages in the city.

The city planner testified that neither parcel conformed to the off-street parking requirements of the city zoning ordinance. Thus the properties constituted nonconforming uses under the zoning ordinance. The city planner testified that the proposed taking would alleviate the parking shortage by eliminating the buildings causing the deficiency.

Defendants' testimony rebutted the city's parking shortage claim. John Chmelko, owner of the print shop, testified that a nearby parking lot was sufficient for his needs. He testified that he and his family lived close by and did not need a space. He testified that the three spots next to his shop were adequate since he rarely had more than one customer at a time.

Mikhael Sitto, owner and operator of a party store, testified that the nine off-street parking spaces next to his building were more than adequate. Hermiz testified that neither of the two renters owned a car. He testified that the users of the newspaper distribution center used the alley to drop papers. Delivery people picked up the papers relatively quickly and were generally on bicycles. Chmelko, Sitto and Hermiz all testified that they had never received a complaint from other businesses or city authorities about a parking problem.

Reiterman conceded that the alleged parking

deficiency involved more of a shortage on paper than in fact. In regard to these two buildings, Reiterman acknowledged that, despite the inadequacy of off-street parking as specified in the zoning ordinance, no actual parking shortage existed now or in the past at this location. Reiterman admitted that no critical parking problems had been observed and no complaints about any parking problems had been received from any city official or from other businesses. Reiterman suggested that the taking of the two properties would eliminate the parking deficiency but he conceded that Rinke's redevelopment plans meant no new public parking places would be created.

City officials also testified that the structures were blighted. The buildings date back to the early 1900's, but Reiterman conceded that the buildings were well-maintained. The consultant hired by the DDA focused his criticism on the newspaper distribution center. Chmelko testified to a variety of improvements to his business and Hermiz testified to the structural soundness of his building.

The real rationale behind the condemnation was explained by the DDA consultant, Gerald Luedtke. He testified to the necessity of preventing the deterioration of the tax base and improving the economic viability of the city's commercial district. He indicated that Rinke Toyota was one of the "economic anchors" of the city and a "magnet" for consumers. "If that dealership were not there, this portion of downtown would be economically dead."

The trial court was unconvinced "that the taking of these properties advances clear and significant public interests."

I

The city first argues that the trial court changed

the burden of proof by initially concluding, in a pretrial motion, that defendant property owners had the burden of proof to show a lack of necessity, either by fraud, error of law or abuse of discretion. MCL 213.56(2); MSA 8.265(6)(2). That section of the statute provides:

> (2) With respect to an acquisition by a public agency, the determination of public necessity by that agency shall be binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion.

Plaintiff then argues that in its final ruling the trial court held against the city by applying a burden of proof other than that which the court originally stated and by holding that it could not find a clear and significant public interest in the taking, after applying the "heightened scrutiny" test of *Poletown Neighborhood Council v Detroit,* 410 Mich 616; 304 NW2d 455 (1981).

We can find no merit in plaintiff's argument. This is not a case where the city presented only its resolution and left it to defendants to prove their case. In fact, plaintiff presented two top city officials and a consultant intimately familiar with the city's condemnation action. Plaintiff does not argue that it did not put forward evidence in reliance on the prehearing ruling regarding the burden of proof. Plaintiff does not proffer other evidence which would weigh in its favor. We believe plaintiff received a full and fair hearing and was not, in fact, unfairly prejudiced by the court's ruling.

In *Poletown* our Supreme Court ruled:

> Where, as here, the condemnation power is exercised in a way that benefits specific and identifia-

ble private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced. Such public benefit cannot be speculative or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by the Legislature. [*Poletown* at 634-635.]

In ruling, the trial court applied this standard to the facts here presented. The nonconforming use argument was a fiction. Proofs at the hearing indicated that parking was more than adequate. This case is distinct from one in which a nonconforming use presents a real hazard. Moreover, the city's "blight" argument also lacked factual substance. We believe that the proofs at the hearing indicate that the city's determination was either fraudulent or an abuse of discretion, especially under the heightened scrutiny test of *Poletown*. We therefore find no error in the trial court's ruling. Plaintiff can show no prejudice to its position by the trial court's ultimate holding which changed neither the law nor the burden of proof.

II

Plaintiff next argues that the city council's determination of public purpose is conclusive and therefore the trial court erred in dismissing plaintiff's condemnation action. Const 1963, art 10, § 2 provides:

Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law. Compensation shall be determined in proceedings in a court of record.

The condemnation of private property for other

than a public use is not sanctioned by the constitution. It is well-established that the power of eminent domain may not be exercised where the intention to confer a private use or benefit forms the purpose or a part of the purpose for the taking. *Shizas v Detroit,* 333 Mich 44, 59-60; 52 NW2d 589 (1952).

There are two lines of authority on the amount of deference a legislative determination as to "public use" is to be given. We first examine the cases under the federal constitution. The United States Supreme Court has recently taken the view that where the state legislature has determined that there are substantial reasons for an exercise of the taking power the courts must defer to that determination. *Hawaii Housing Authority v Midkiff,* 467 US 229; 104 S Ct 2321; 81 L Ed 2d 186 (1984); see also *Berman v Parker,* 348 US 26; 75 S Ct 98; 99 L Ed 27 (1954) (where Congress has made a determination of public purpose, such determination is "well-nigh conclusive"; the Legislature, not judiciary, is the main guardian of public need); *United States ex rel Tennessee Valley Authority v Welch,* 327 US 546; 66 S Ct 715; 90 L Ed 843 (1946) (congressional determination of public use entitled to deference unless shown to involve an impossibility).

Another line of Supreme Court cases holds that the ultimate determination of whether the nature of a use is public or private is for the judiciary rather than the legislature. See e.g. *Cincinnati v Vester,* 281 US 439; 50 S Ct 360; 74 L Ed 950 (1930); *Rindge Co v Los Angeles Co,* 262 US 700; 43 S Ct 689; 67 L Ed 1186 (1923). See generally Anno: *When is taking of property for "public use" so as to be permissible under federal constitution if just compensation is provided—Supreme Court cases,* 81 L Ed 2d 931.

We note that the cases upholding the deference given to legislative determinations involve a congressional decision or a state legislative determination upheld by a *state court.* However, in *Cincinnati v Vester, supra,* the case most similar to our facts, the Court rejected a city resolution of public purpose. While concluding that legislative declarations of local factors was due great deference, the Court ruled that public use was ultimately a judicial question.

In Michigan, a long line of eminent domain cases have held that the "public use" question is ultimately a judicial one. *General Development Corp v Detroit,* 322 Mich 495, 498; 33 NW2d 919 (1948); see also *Lakehead Pipe Line Co v Dehn,* 340 Mich 25, 39-40; 64 NW2d 903 (1954); *Cleveland v Detroit,* 322 Mich 172, 179; 33 NW2d 747 (1948); *Portage Twp Bd of Health v Van Hoesen,* 87 Mich 533, 539; 49 NW 894 (1891).

Plaintiff relies on language in *Poletown, supra,* in support of its proposition that the city resolution of public purpose should be conclusive on the courts. We now turn in greater detail to the *Poletown* decision.

*Poletown* arose out of the economic crisis which faced Detroit and its most significant economic buttress, the automobile industry, in the 1970s and early 1980s. In 1981, unemployment in the City of Detroit reached eighteen percent. *Poletown* at 647 (RYAN, J., dissenting). In 1980 General Motors entered discussions with the city to build a "new generation facility" in Detroit if a suitable site could be found to replace its aging Cadillac and Fisher Body facilities. Underlying the discussions was the threat that if no such site could be found, taken and made available to General Motors, it would close its plant, take the six thousand jobs those plants represented and go elsewhere.

Reacting to the dismal economic climate and the steady loss of manufacturing facilities in Michigan, the Michigan Legislature had previously passed the Economic Development Corporations Act, 1974 PA 388, MCL 125.1601 *et seq.*; MSA 5.3520(1) *et seq.* The act provided that in order to "alleviate and prevent conditions of unemployment" municipalities were granted the power to assist "industrial and commercial enterprises" to revitalize their facilities. MCL 125.1602; MSA 5.3520(2). To further this objective, the Legislature authorized municipalities to acquire property by condemnation in order to provide industrial and commercial sites and the means of transfer from the municipality to private users. MCL 125.1622; MSA 5.3520(22).

The narrow question presented in *Poletown* was whether the statute authorizing the taking was constitutional. The Supreme Court deferred to the legislative determination of public purpose, and concluded that the benefit to the city was "clear and significant" and therefore sufficient to satisfy the Court that this "project was an intended and a legitimate object of the Legislature" even though "a private party will also . . . receive a benefit as an incident thereto." *Poletown* at 634.

We read the factual context of *Poletown* as extremely significant to the holding in that case. We do not take *Poletown* to be a complete refutation of the judiciary's *ultimate* power to review a city council's determination of public purpose. Rather, we believe the decision illuminates the deference which must be accorded the state Legislature in the context of the Economic Development Corporations Act.

The Court did in fact place a predicate on its holding:

Our determination that this project falls within the public purpose, as stated by the Legislature, does not mean that every condemnation proposed by an economic development corporation will meet with similar acceptance simply because it may provide some jobs or add to the industrial or commercial base. *If the public benefit was not so clear and significant, we would hesitate to sanction approval of such a project. The power of eminent domain is restricted to furthering public uses and purposes and is not to be exercised without substantial proof that the public is primarily to be benefited. Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced.* Such public benefit cannot be speculative or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by the Legislature. [*Poletown* at 634-635.]

The instant case is one in which "heightened scrutiny" should apply since the record readily indicates that the land, if condemned, would be made available to a private party, Rinke Toyota.

Plaintiff argues that a state statute provides that condemnation of a nonconforming use is a proper public purpose. MCL 125.583a; MSA 5.2933(1). At the hearing this argument was seen to be a mere pretense. The parking spaces available were more than sufficient for the two businesses. Furthermore, Rinke's plan involves an inventory storage lot and not additional public parking. Testimony also revealed that the buildings, while older, were structurally sound and, according to Reiterman, the Assistant City Manager, well-maintained. We see no "clear and significant" public benefit. There is no "substantial proof" that the public is to be primarily benefitted. In fact, the primary beneficiary will be Rinke Toyota. The

public's interest is marginal or, indeed, speculative. We therefore conclude that the city's determination does not pass heightened judicial scrutiny under the standard of *Poletown*.

Our ruling here is further confirmed by a recent decision of the Delaware Supreme Court. In *Wilmington Parking Authority v Land With Improvements,* 521 A2d 227 (Del, 1986), the Wilmington Parking Authority brought a condemnation action against property in the downtown area of Wilmington adjacent to the News-Journal Company's principal facility. The authority alleged that the property was necessary for a public parking facility. The condemnation plan, however, provided for the transfer of a substantial portion of the property to the News-Journal for construction of an addition to its facility. The trial court found that the "paramount benefit" of the project was to the News-Journal and dismissed the condemnation action.

The Delaware Supreme Court affirmed. Initially the supreme court noted the *Poletown* "heightened scrutiny" test and determined that the question of public purpose was ultimately a judicial one, citing *Cincinnati, supra.* Determining that a decision on public versus private primary purpose required an examination of the "consequences and effects" of a particular project, the court concluded that review of the "underlying purpose" was appropriate. In affirming, the supreme court concluded that the lower court had committed no legal error in its determination of the primary purpose of the project.

We approve the reasoning in that decision. Any benefit to the public is purely derivative of the primary purpose: the city's continued good relations with Rinke Toyota. While it may be true that the public would derive some benefit from the

expansion plans of Rinke Toyota, that would be true of any business. That the automobile dealer is a substantial factor in the business life of the city does not permit it to use city government to eliminate small businesses in order to facilitate its growth. We do not interpret *Poletown* to mean that whenever a substantial corporate enterprise needs room to expand it can threaten to move and then use that threat, even if real, as leverage to induce the local government to destroy smaller interests. Before that can be allowed to occur, the courts as protectors of the interests of all must look at the purpose of the taking with great vigilance. That is precisely what Judge Jeannette did. He reached the correct result.

### III

Finally, plaintiff argues that the failure of the trial court to render its decision within sixty days amounts to error requiring reversal. MCL 213.56(4); MSA 8.265(6)(4). The city apparently did not raise the issue below and points to nothing which would evince prejudice. We believe the error was harmless.

Affirmed.