582 N.W.2d 596 (1998)
In the Matter of Condemnation by Petitioner, the MINNEAPOLIS COMMUNITY DEVELOPMENT AGENCY (MCDA), OF CERTAIN LANDS IN THE CITY OF MINNEAPOLIS SITUATED IN DEVELOPMENT DISTRICT NO. 57, SOUTH NICOLLET MALL.
MINNEAPOLIS COMMUNITY DEVELOPMENT AGENCY (MCDA), petitioner, Respondent,
v.
OPUS NORTHWEST, LLC, a Delaware limited liability company, Appellant,
University of St. Thomas, et al., Respondents Below, and
OPUS NORTHWEST, L.L.C., a Delaware limited liability company, Appellant,
v.
MINNEAPOLIS COMMUNITY DEVELOPMENT AGENCY, Respondent,
City of Minneapolis, Respondent.
No. C2-98-276.
Court of Appeals of Minnesota.
August 25, 1998.
*597 John M. LeFevre, Jr., Robert J. Lindall, Robert A. Alsop, Stephen J. Bubul, Kennedy & Graven, Chartered, Minneapolis, and Michael L. Schwab, Development Counsel, Minneapolis Community Development Agency, Minneapolis, for respondent Minneapolis Community Development Agency.
Douglas A. Kelley, John M. Lee, Steven E. Wolter, Douglas A. Kelley, P.A., Minneapolis; and James S. Holmes, Sean D. Kelly, Holmes & Galey, Ltd., Minneapolis, and Regina M. Chu, Regina M. Chu, P.A., Minneapolis; and John D. Hagen, Jr., Minneapolis, and Leland J. Frankman, Minneapolis, for appellant.
Jay Heffern, Minneapolis City Attorney, Michael T. Norton, Deputy City Attorney, James A. Moore, Assistant City Attorney, Minneapolis, for respondent City of Minneapolis.
Considered and decided by SCHUMACHER, P.J., and RANDALL and KALITOWSKI, JJ.

*598 OPINION
SCHUMACHER, Judge.
A joint trial was held on the condemnation of appellant Opus Northwest, L.L.C.'s property and its civil taxpayer action under the tax increment financing statute. The trial court decided both actions in favor of respondents Minneapolis Community Development Agency and City of Minneapolis (the city). We affirm.

FACTS
The city seeks to invoke the power of eminent domain to take two parcels of property located on Nicollet Mall in downtown Minneapolis. The condemnation is being undertaken to serve the city's desire to locate a mid-priced retail store, parking complex, extended skyway access, and an office building in the south Nicollet Mall area. Due to the high cost of downtown property, the city has used tax increment financing to attract a mid-priced retailer to locate downtown.
The city has been unsuccessful for a number of years in bringing development projects to south Nicollet Mall. There has been no large-scale development in the area for a number of years, and the city complains that a lack of skyway connections, insufficient parking, and parcelization of land ownership prevents projects that could improve the tax base and economy of the area. In the mid-1980s, the city designated the area as a redevelopment district and a tax increment financing district. At that time, it made detailed findings supporting those designations. In 1996, before commencing the Ryan-Dayton Hudson project, the city updated and confirmed its earlier findings.
The city is contracting with Ryan Corporation for the development, construction, and eventual ownership of much of the project. The retail store will be owned and operated by the Dayton Hudson Corporation, which will place a Target store on the first and second floors of the building (hereinafter Dayton Hudson and Target collectively referred to as Dayton Hudson).
Opus is the owner of the two parcels being condemned. Before the city and Dayton Hudson chose Ryan, Opus also bid on the project, but it was not chosen because, among other reasons, Opus could not secure a mid-priced retailer as an anchor tenant. Opus now proposes to build a $120 million office building on its property without any government subsidies, however, its current proposal still does not contain a mid-priced anchor retailer. Opus objected to the condemnation proceedings.
Minneapolis ordinances require contractors to file affirmative action plans before doing business with the city. Dayton Hudson has not filed an affirmative action plan with the city. Opus, as a private taxpayer under the tax increment financing statutes, challenges the legality of the overall project.

ISSUES
1. Did the trial court err when it approved the condemnation petition?
2. Did the trial court err when it upheld the city's proposed use of and procedures for tax increment financing?

ANALYSIS

1. Condemnation
From the 19th century to the present, the judiciary's review of condemnation proceedings has remained "very narrow." State ex rel. Simpson v. Rapp, 39 Minn. 65, 67, 38 N.W. 926, 928 (1888); County of Dakota (C.P.46-06) v. Lakeville, 559 N.W.2d 716, 719 (Minn.App.1997). We review only whether the taking serves a public purpose and is necessary. City of Duluth v. State, 390 N.W.2d 757, 763, 764 (Minn.1986).
Great weight must be given to the determination of the condemning authority, and the scope of review is narrowly limited. If it appears that the record contains some evidence, however informal, that the taking serves a public purpose, there is nothing left for the courts to pass upon. * * * The court is precluded from substituting its own judgment for that of the [public body] as to what may be necessary and proper to carry out the purpose of the plan.
Id. at 763 (quoting Housing & Redev. Auth. v. Minneapolis Metro. Co., 259 Minn. 1, 15, *599 104 N.W.2d 864, 874 (1960)). Public purpose and necessity are questions of fact, and the district court's decisions on these matters will not be reversed on appeal unless clearly erroneous. State by Humphrey v. Byers, 545 N.W.2d 669, 672 (Minn.App.1996).
Opus admits that this court should show deference to the city's legislative condemnation findings but contends that the deference should not be "slavish." Opus argues that "substantial authority" requires that we apply a "heightened scrutiny" to any condemnation that benefits private interests. Opus's foreign authority, however, is distinguishable. See Wilmington Parking Auth. v. Land With Improvements, 521 A.2d 227, 230-31 (Del.1986) (government parking authority acted outside its narrow statutory parking power when underlying purpose of condemnation was to benefit newspaper, not create parking); City of Lansing v. Edward Rose Realty, Inc., 442 Mich. 626, 502 N.W.2d 638, 645 (1993) (city sought to condemn apartment building because owner refused to use city's franchised cable company; court held condemnation served no public purpose because there was no statutory grant of power to allow access for cable T.V., and public benefit was not clear and predominant); Poletown Neighborhood Council v. City of Detroit, 410 Mich. 616, 304 N.W.2d 455, 457, 459 (1981) (court, despite announcing it was using heightened standard, affirmed Detroit's condemnation of land to allow General Motors to construct assembly plant to increase employment and revitalize economic base of community); City of Ctr. Line v. Chmelko, 164 Mich.App. 251, 416 N.W.2d 401, 402 (1987) (city's condemnation was "complete fiction" because city acted as agent for local car dealer and alleged public purposes were not supported by the evidence); City of Jamestown v. Leevers Supermarkets, Inc., 552 N.W.2d 365, 372, 374 (N.D.1996) (case remanded for court to determine if "primary object" was public; court noted trend is to allow broad legislative discretion to use powers of eminent domain for variety of economic development purposes).
Unlike the condemnations criticized in City of Lansing and Wilmington Parking, the condemnation of Opus's property falls within the city's prescribed authority. Additionally, it appears that the application of a heightened level of scrutiny to review condemnation proceedings, for which Opus cites these foreign cases, is out of touch with the national trend. 2A Nichols on Eminent Domain, § 7.06[24][c], at p. 7-242 (Matthew Bender revised 3d ed. 1998) (trend is to sanction "broad legislative discretion to use eminent domain for a variety of economic development purposes.").
Finally, Opus's foreign authority is inconsistent with Minnesota caselaw. Minnesota courts have not employed a heightened standard of review in appeals involving governmental condemnation benefiting private parties. See, e.g., City of Duluth, 390 N.W.2d at 763-64 (condemnation of Jeno Paulucci's Chun King plant to allow a paper mill to be built); City of Minneapolis v. Wurtele, 291 N.W.2d 386, 390 (Minn. 1980) (condemnation of private property to construct City Center in downtown Minneapolis). We reject the invitation to change our well-established and limited standard of review.
What constitutes a "public use" or "public purpose" is broadly defined. City of Duluth, 390 N.W.2d at 763. As noted, it includes a city's acquisition of private property for use by a different private entity. Id. at 763-64. If there is some evidence in the record that the taking serves a public purpose, there is nothing left for the court to decide. Id.
Condemnation efforts undertaken to enhance deteriorating urban areas and to create jobs satisfy the public purpose aspect of a condemnation proceeding. Id. at 763; see also Wurtele, 291 N.W.2d at 390. The legislature has recognized that actions taken to foster new development, including the financing thereof, "in areas of a city that are already built up in order to provide employment opportunities, to improve the tax base, and to improve the general economy of the state * * * are [examples of] a public purpose." Minn.Stat. § 469.124 (1996). In this case, the city presented testimony that the proposed project will have the following benefits: a mid-priced retail store, increased parking, increased employment, increased tax base, extension of the skyway system, *600 unification of the multiple-ownership/parcelization of the area, modernization of outdated and incompatible buildings, and furtherance of the city's ultimate objective of creating an economically viable retail corridor between downtown businesses and the convention/hospitality district. The city also presented evidence that these objectives will not be met by Opus's proposal or without the city's involvement. The finding of public purpose in this case is consistent with the authority granted by the legislature in section 469.124, and it is not clearly erroneous.
Absolute necessity is not required for a finding of public purpose, rather "[i]t is enough to find that `the proposed taking is reasonably necessary or convenient for the furtherance of a proper purpose.'" City of Duluth, 390 N.W.2d at 764-65 (quoting City of Pipestone v. Halbersma, 294 N.W.2d 271, 274 (Minn.1980)) (emphasis added). A party challenging the necessity of the condemnation of a parcel will not succeed by merely suggesting alternatives to the government's plan. Id. at 766. Accordingly, Opus's argument, to the extent that it relies on Opus's own plan to build an alternative tower, is not persuasive.
The heart of Opus's appeal involves challenges to the legality and attainability of the city's condemnation. Any corporation contracting with the City of Minneapolis must have an affirmative action plan filed with the city. Minneapolis, Minn., Code of Ordinances (hereinafter MCO) § 139.50(b), (c) (1997). The city ordinance applies specifically to tax increment financing contracts and to owner-occupants of any project financed through tax increment financing. MCO § 139.50(d) (1997) (citing Minnesota Tax Increment Financing Act).[1] Dayton Hudson will be the eventual owner occupant of the tax-increment-financed, mid-priced retail store. Dayton Hudson, however, does not have an affirmative action plan on record with the city and is not currently permitted to contract with the city for that reason. Opus contends that the condemnation is, therefore, illegal.
Opus relies on three early Minnesota Supreme Court cases in support of its argument. In each of those cases, the supreme court found that the proposed condemnation of rivers and lakes to create a utility plant was illegal and, therefore, the condemnations could not go forward. See Minnesota Canal & Power Co. v. Fall Lake Boom Co., 127 Minn. 23, 31-32, 148 N.W. 561, 564 (1914) (condemnation denied, despite approval by U.S. government, because Minnesota Canal, in order to make its plant work, would need to obtain greater amounts of navigable water than allowed by state statute); Minnesota Canal & Power Co. v. Pratt, 101 Minn. 197, 222-23, 112 N.W. 395, 401-02 (1907) (condemnation prohibited because, despite change in state laws, waters in question were also federal and Minnesota Canal did not receive permission from U.S. government); Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429, 443, 107 N.W. 405, 410 (1906) (condemnation prohibited due to absence of state and federal laws allowing alienability of navigable waters).
In sum, the Minnesota Canal trilogy stands for the proposition that a condemning authority cannot undertake a public project if the project itself is not permitted by law. The public purposes for the present condemnation (obtaining a mid-priced retail store, increased public parking and employment, etc.) and the means of accomplishment (through tax increment financing for Ryan) are all legal. In the Minnesota Canal cases, however, the diversion of lakes and rivers, no matter how attempted, was not permitted by law.
In addition, Opus's challenge to the legality of Dayton Hudson's occupancy is anticipatory. The ordinance requires an owner-occupant of a tax-increment-financed project to file an affirmative action plan with the city. It is contemplated that Dayton Hudson will be the eventual owner-occupant of *601 the mid-priced retail store included in this project, but Dayton Hudson is not a current owner-occupant and is not now in violation of MCO § 139.50. In its brief and at oral argument, the city argued that the goals for which condemnation was initiated are not dependent on a specific retailer or developer. To date, the city has signed a development contract with Ryan; neither that agreement nor the contemplated building of a mid-priced retail store is illegal. In the event Dayton Hudson violates the city ordinance, a controversy will exist upon which a court can pass judgment. See Izaak Walton League of Am. Endowment, Inc. v. State, Dep't of Natural Resources, 312 Minn. 587, 589, 252 N.W.2d 852, 854 (1977) ("The existence of a justiciable controversy is prerequisite to adjudication. The judicial function does not comprehend the giving of advisory opinions."). Because there is no existing illegality affecting the project as a whole, we decline to speculate on the likelihood of a future violation of MCO § 139.50. The condemnation is not barred by the fact that Dayton Hudson does not have an affirmative action plan on file with the city.[2]
Opus also argues that there can be no proper or necessary purpose if the project for which property is condemned is too speculative, relying on a Wisconsin case holding that a private owner is "entitled to have it shown that the taking is for a public use definite and certain of attainment." Schumm v. Milwaukee County, 258 Wis. 256, 45 N.W.2d 673, 676 (1951). In Schumm, a non-profit group and the county entered into negotiations for condemnation of property upon which the non-profit group intended to construct war memorials. Id. 45 N.W.2d at 674. Without any of the necessary resolutions, the county instructed its counsel to commence condemnation proceedings. Id. 45 N.W.2d at 675. There was no valid contract between the county and the non-profit group. Id. 45 N.W.2d at 676. There were numerous details to be resolved, including the specifications for the memorials, the amount of money required, whether resolutions would be passed, and whether the city in which the proposed memorials were to be placed would grant permission to the county. Id. 45 N.W.2d at 677. The county's agreement with the group was too riddled with uncertainty to justify the taking of private property. Id.
Opus suggests that the lack of finality to some details of the development agreement between the city and Ryan render the project similar to that in Schumm and too speculative to justify condemnation. This case differs substantially and significantly from Schumm. First, the city supports and has passed resolutions directing the project to go forward. Second, there is a written contract between the city and Ryan and Dayton Hudson is committed to the project, assuming that this litigation can be resolved. Third, funding is in place through the tax increment financing plan and Ryan. Fourth, while there have been no negotiations with owners on block 34, this is within the city's control, and there is no need to secure the approval of a distinct governing authority. Finally, the contingencies that exist appear to be normal for this stage and type of development, and Opus has presented no evidence that the Ryan-city contract is out of the ordinary.
The trial court concluded that there was no evidence to suggest that the project would not be completed once the cloud of litigation was removed. The relative certainty of this project stands in marked contrast to the ambiguity and uncertainty of the plans for the property to be condemned by the county in Schumm. Considering our standard of review, the trial court's finding that the public purpose of the project is proper and not speculative is supported by the evidence and is not clearly erroneous.

2. Tax Increment Financing
Opus challenges the use of tax increment financing money in this project as a private taxpayer under Minn.Stat. § 469.1771, subd. 1(a) (1996). The statute provides:

*602 The owner of taxable property located in the city, town, school district, or county in which the tax increment financing district is located may bring suit for equitable relief or for damages, as provided in subdivisions 3 and 4, arising out of a failure of a municipality or authority to comply with the provisions of sections 469.174 to 469.179, or related provisions of this chapter.
Id. This court reviews statutory construction de novo. Hibbing Educ. Ass'n v. Public Employment Relations Bd., 369 N.W.2d 527, 529 (Minn.1985). Findings of fact and credibility determinations, upon which the trial courts base legal conclusions, will not be set aside unless clearly erroneous. Minn. R. Civ. P. 52.01.[3]
In 1983, the city declared the area in question on the south Nicollet Mall to be a redevelopment district. In 1985, the area in question was designated as tax increment financing District 63. Opus has not challenged the findings supporting either decision. In 1996, before the city condemned Opus's property, it made new, summary findings that updated and confirmed the findings made in 1983 and 1985. At issue is whether the tax increment financing statute required the city's 1996 findings and, if so, whether they were sufficiently detailed. The city's 1996 findings concluded that private investment would not be forthcoming and that tax increment financing would generate higher property values than any purely private investment.
Before a tax increment financing district can be created, a municipality must make the necessary findings. Minn.Stat. § 469.175, subd. 3 (1996).[4] Once the district is properly created, however, a municipality may modify a tax increment financing plan with no specified procedure or findings unless modification includes an increase in the bonded indebtedness or there are other circumstances identified in the statute and not present here. Minn.Stat. § 469.175, subd. 4 (1996). Specifically, in the absence of changes specified in Minn.Stat. § 469.175, subd. 4, changes to an existing tax increment financing plan constitute "modification" for which no new findings are required and no procedure is prescribed by the statute.
Under Minn.Stat. § 469.175, subd. l(a)(5)(ii) (1996), an original tax increment financing district plan must include an estimate of the "amount of bonded indebtedness to be incurred." The original tax increment financing plan for this area anticipated that $157 million of indebtedness would be incurred. It appears that only two projects financed by tax increment financing ever drew on the authorized total indebtedness. These projects total $36.4 million. Because the current project is estimated to cost $62 million, the three projects do not exceed the total estimated indebtedness. Accordingly, since the "amount of bonded indebtedness" is not being increased, the 1996 decision is a mere modification of the existing plan and Minn.Stat. § 469.175, subd. 4 does not require the city to issue new, detailed findings. We affirm the trial court's conclusion that Opus failed to establish the existence of a statutory violation.[5]

DECISION
The trial court's findings of public purpose and necessity are supported by the evidence and are not clearly erroneous. The failure of Dayton Hudson to file an affirmative action *603 plan does not render the project illegal. Further, because the project is supported by the city and is the subject of a contract between the city and Ryan, the condemnation is not based on speculation. Finally, the city was not required to make new findings because the current project does not require an increase in the amount of bonded indebtedness authorized in the original tax increment financing plan.
Affirmed.
NOTES
[1] The ordinance reads: "With regard to development contracts including * * * [tax increment financing contracts], the jurisdiction of the City * * * shall extend * * * three (3) years from the date of the contract or until such longer period as may be stated in the contract and shall include jurisdiction over owner-occupants of any project financed pursuant thereto." MCO § 139.50(d) (emphasis added).
[2] The city filed a notice of review asking this court to correct what it believed were errors in the trial court's analysis on legality. We are not persuaded that the trial court's analysis was in error.
[3] Because we conclude that the existing findings are sufficient, we need not address the city's assertion that the challenge to these findings should have been made by certiorari.
[4] Those findings are: (1) "that the proposed tax increment financing district is a redevelopment district," and (2) that the redevelopment, in the opinion of the municipality, would not reasonably be expected to occur solely through private means within the near future and that the increase in market value through the use of tax increment financing funds will exceed the increase in market value for the district if no tax increment financing funds were invested. Minn.Stat § 469.175, subd. 3 (1996).
[5] We affirm the trial court's decision not to consider Opus's challenge to the "Common Project" because Opus did not litigate its propriety except as it applied to the condemnation proceedings, and the city did not rely on it as authority for its condemnation.